**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| **FRED TARVER, SR.,** | § | |
| | § | |
| **Petitioner,** | § | |
| **v.** | § | **CIVIL ACTION V-03-39** |
| | § | |
| **CITY OF EDNA and RANDY CRIDER,** | § | |
| **INDIVIDUALLY AND AS CHIEF OF,** | § | |
| **POLICE OF CITY OF EDNA AND,** | § | |
| **KENT BUBELA, INDIVIDUALLY** | § | |
| | § | |
| **Respondents.** | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant City of Edna's Motion for Summary Judgment (Dkt. #74). The Court, after reviewing the motion, the responses by the parties and the relevant law, is of the opinion that the motion should be GRANTED for the reasons set forth below.

### Factual and Procedural Background

On August 1, 2001 in Edna, Texas, a marital dispute between Freddie Tarver, Jr. ("Freddie") and Christina Tarver ("Christina") culminated with Freddie leaving for his parents' house with the couple's two-year-old son, Dylan Tarver ("Dylan"). When Freddie left, Christina called the Edna Police Department and spoke with an officer who explained that the police could not intervene because Freddie had lawful custody of Dylan. The next morning, Christina went to Kidz World, a daycare center owned by Freddie's parents, Fred Tarver, Sr. ("Mr. Tarver") and his wife, Vera Tarver ("Vera"), where Christina believed Dylan would be. When Christina arrived, she confronted Vera, who explained that Freddie had left Dylan in her care and that she would not be returning the child to Christina. When Christina told Vera that she had the right to take Dylan, Vera fled the

1

facility with the child.

Christina then telephoned the Edna Police Department a second time, requesting assistance in light of the new circumstances. The department dispatched Officer Kent Bubela ("Officer Bubela") to Kidz World, where he met with Christina. After hearing Christina's account of the events, Officer Bubela requested that one of the Kidz World employees call Vera and ask her to return Dylan. After the employee reached Vera, Officer Bubela informed her that if she did not return to the center with Dylan, she could be subject to criminal prosecution. Vera hung up on Officer Bubela but contacted Freddie to inform him that she was returning to Kidz World with Dylan and that he should come there to pick up Dylan.

When Vera reached the center, Officer Bubela reiterated that she must return Dylan to Christina, but Vera again refused. Mr. Tarver arrived about this time. The City of Edna Chief of Police, Randy Crider ("Chief Crider"), arrived within a few minutes to assist Officer Bubela at the scene. After ascertaining the relevant information, Chief Crider informed those present that Dylan needed to be returned to Christina.

Many of the remaining facts are in dispute, but for purposes of a motion for summary judgment, the Court is to accept the facts as alleged by the non-movant. Therefore, the Court will convey the remaining facts as they were characterized by the non-movant, Mr. Tarver. Mr. Tarver claims that he was pleading with the officers to wait until his son arrived to determine whether Dylan should be handed over to Christina. Mr. Tarver alleges that he attempted to give Officer Bubela his mobile phone in order to speak with Freddie's attorney who was on the line. According to Mr. Tarver, Officer Bubela refused and knocked the phone out of Mr. Tarver's hand. At this point, Chief Crider directed Officer Bubela to arrest Tarver, who was never read his rights. Mr.

Tarver was handcuffed behind his back with two pairs of handcuffs linked together to accommodate his large stature.  Mr. Tarver alleges that Officer Bubela and Chief Crider forced (threw and/or pushed) him into the backseat of the patrol car and did not protect his head.  Mr. Tarver claims that he was shoved into the patrol car on his side with his head facing the driver side, away from any ventilation.  It is not in dispute that it was a hot day and that the patrol car was not running.

It is undisputed that Mr. Tarver never had physical control of Dylan, nor did he try to block the officers' access to Dylan or make any threatening remarks to the officers.  Dylan remained in Vera's car with her until, Mr. Tarver alleges, a Kidz World employee, Samantha Gerdes, removed Dylan from the car to get him out of the heat and placed him in Christina's custody at the behest of Officer Bubela.  Mr. Tarver claims that this took place after he was arrested, but before his son, Freddie, arrived at Kidz World.

Vera Tarver has testified that, while Mr. Tarver was being arrested, she advised Officer Bubela and Chief Crider that her husband had a previous stroke and was a diabetic.  Officer Bubela allegedly responded that he did not care.  Mr. Tarver also claims that he attempted to inform Officer Bubela about his health conditions and was similarly told that the officer did not care.

Because the car's air conditioner was turned off, and Tarver was feeling hot and distressed, he began tapping on the police car window with his feet.  Vera walked over and opened the vehicle's back door to check on her husband.  Vera has testified, and Mr. Tarver claims, that Officer Bubela rushed over and slammed the car door on Mr. Tarver's foot.  Mr. Tarver claims that the impact of the door was severe enough to knock his shoe off and injure his back.

When Freddie arrived he had Chief Crider speak with Freddie's attorney on his cell phone. Freddie informed Officer Bubela that his father suffered from numerous medical ailments and

3

appeared to need some air.  According to Freddie, Officer Bubela angrily told him that he didn't care.  Seeing that his father was red-faced and sweating profusely, Freddie opened the back door to the police cruiser to give Mr. Tarver some air.  Because Mr. Tarver's head and neck were propped up against that door, his head fell out of the car when the door was opened.  According to Mr. Tarver, Freddie, and Vera, Officer Bubela rushed over and used his foot to slam the car door closed. Because Mr. Tarver's head was protruding from the car, the door slammed on his head and bounced back. When Freddie protested, Officer Bubela allegedly angrily responded that "it is not my f------ father." Subsequently, Chief Crider concluded his conversation with Freddie's attorney, Dylan was returned to Freddie's custody, and Mr. Tarver was released.

According to testimony from Mr. Tarver and Vera Tarver, within fifteen to thirty minutes after the incident with Officer Bubela and Chief Crider, the Tarvers visited the Mayor of the City of Edna ("Mayor") and reported the incident, expressed their concern about Officer Bubela's conduct, and disclosed that Mr. Tarver had suffered injuries.  It is an undisputed fact that at no time following the incident, before this litigation was filed, did the City or any City official investigate Mr. Tarver's claims or reprimand Officer Bubela.

Mr. Tarver filed suit against Chief Crider, Officer Bubela, and the City of Edna under 42 U.S.C. § 1983, claiming that the officers violated his Fourth and Fourteenth Amendment rights by arresting him without probable cause and by using excessive force in three instances: handcuffing him, slamming the police car door on his foot, and slamming the car door on his head.  Mr. Tarver averred that he suffered physical injuries, emotional pain and suffering, mental anguish, headaches, and depression, and required surgery as a result of the officers' violations of his clearly established rights.

The officers moved for summary judgment on qualified immunity grounds. After reviewing a decision by this Court on the motion for summary judgment, the Fifth Circuit Court of Appeals found that Officer Bubela and Chief Crider had probable cause to arrest Mr. Tarver because he "repeatedly attempted to speak to the officers to persuade them not to give the child to his mother."[1] The Appellate Court also found that the injury Mr. Tarver received from the handcuffing was too deminimis to give rise to § 1983 liability. Consequently, the Appellate Court held that Officer Bubela and Chief Crider should be entitled to qualified immunity as to the arrest and handcuffing of Mr. Tarver. Conversely, The Appellate Court held that Officer Bubela was not entitled to qualified immunity as to the alleged door slamming incidents. There was no allegation that Chief Crider was an active participant in the slamming incidents, therefore the claims against him were dismissed following the Fifth Circuit's opinion.

The City of Edna has filed the present motion for summary judgment on the grounds that it cannot be held liable under § 1983 for Officer Bubela's conduct.

### Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Village, LP v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."

---

[1] *Tarver v. City of Edna et al*, 410 F.3d 745, 751 (5th Cir. 2005).

*Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact.  *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant.  *See Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998); *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995).  "The court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion."  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).  However, the non-movant cannot avoid summary judgment by presenting only "conclusory allegations," or "unsubstantiated assertions," such as the bare allegations of a complaint, but must present sufficient evidence, such as sworn testimony in a deposition or affidavit, to create a genuine issue of material fact as to the claim asserted.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc).

### Discussion

Our analysis must begin with the proposition that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  Monell v. New York City Dept. of Soc. Srvs., 436 U.S. 658, 691 (1978).  In order to hold the City liable under 42 U.S.C. § 1983, Plaintiff must prove that a "policy" or "custom" of the City directly or proximately caused the alleged deprivation of Plaintiff's

constitutional rights. *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir.2002) (citing *Monell*, 436 U.S. at 478); *See Brown v. Bryan County, Okla., et al*, 219 F.3d 450, 457 (5th Cir. 2000). Defendant correctly states in its motion that, following the Fifth Circuit's opinion on the officers' qualified immunity, the only remaining incidents potentially qualifying as constitutional deprivations are the instance of Officer Bubela allegedly slamming the car door on Mr. Tarver's foot and the instance of Officer Bubela allegedly slamming the car door on Mr. Tarver's head (collectively referred to as "the slamming incidents"). Thus, the relevant inquiry is whether the summary judgment record supports a finding that a City of Edna policy or custom directly caused (was the moving force behind) the slamming incidents.

The City of Edna ("the City") contends that the record establishes as a matter of law that the slamming incidents were isolated events that cannot evidence a policy or custom of the City. The City argues that it cannot be held vicariously liable for the conduct of its employee. Generally, a plaintiff asserting a § 1983 claim must demonstrate the existence of either an official policy adopted and promulgated by the unit of government, or a "persistent, widespread practice of [government] officials or employees" that is "so common and well settled as to constitute a custom that fairly represents policy." *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir.1992). The official policy or custom requirement reflects Congress's judgment that a municipality should only be held liable under § 1983 for its own constitutional torts. *Board of County Com'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403 (1997). The Supreme Court has interpreted this limitation to exclude municipal liability under a theory of *respondeat superior*. *Id.* The culpability element, which may overlap with proof of policy, requires evidence that a City action giving rise to a policy or custom was taken with "deliberate indifference" to its known or obvious consequences. *Brown*, 219 F.3d at 457. A

7

showing of simple or even heightened negligence will not suffice. *Id.* The causation element requires Plaintiff to show that the objectionable City policy was the "moving force" behind the Plaintiff's injury. *Bryan County*, 520 U.S. at 408. Therefore, analysis of the actions allegedly giving rise to City liability in this case requires the Court to carefully consider whether those actions can be fairly attributed to the City of Edna.

Plaintiff has advanced three theories under which he believes a City policy causing Officer Bubela's allegedly objectionable conduct can be established. First, Plaintiff contends that the City failed to formally adopt certain essential policies regarding the circumstances surrounding the slamming incidents. Second, Plaintiff alleges that the City failed to properly train Officer Bubela regarding the subject matter of the allegedly missing essential policies. And finally, Plaintiff contends that Chief Crider's actions as a "final decision-maker" condoned and ratified Officer Bubela's actions belying a City policy or custom of condoning such use of force considered excessive under the Fourth Amendment. The Court will consider the sufficiency of each of these theories separately.

## A.  Failure to Adopt Essential Policies

Plaintiff argues that the City is subject to § 1983 liability because the City failed to implement policies for police officers governing (1) the handling of civil matters; (2) the handling of arrestees and detainees with serious health problems; (3) the placing of persons in the back seat of a patrol car; (4) the transporting and carrying persons who are too large to sit upright in a police car; and (5) the handling of a situation when a third party comes to the aid of an arrestee or detainee. Plaintiff's arguments are without merit.

For a claim to be predicated under § 1983, plaintiff must allege (1) a constitutional or federal

right was violated; (2) the deprivation was committed by a person acting under the color of state law; and (3) an official policy or custom of the municipality was a cause in fact of the violation. *Leffall v. Dallas Indep. Sch. Dist.,* 28 F.3d 521, 525 (5th Cir. 1994) (quoting *Monell*, 436 U.S. at 690-91). With regard to an official policy being a cause in fact, it suffices for plaintiff to allege a failure to adopt a policy "if the need to take some action to control the agents of the local government entity is so obvious and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymak[er] ... can be reasonably said to have been indifferent to the need". *Burge v. Parish of St. Tammany*, 187 F.3d 452, 471 (5th Cir. 1999) (quoting *City of Canton*, 489 U.S. at 390).

Plaintiff maintains that the City failed to adopt a policy regarding the handling of civil matters, thereby causing Plaintiff's injury. Plaintiff, however, incorrectly characterizes the underlying events of this case as civil. The Fifth Circuit has determined that Officer Bubela and Chief Crider "reasonably 'concluded that [Mr. Tarver] had committed or was committing an offense.'" *Tarver*, 410 F.3d at 751 (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)). The Appellate Court also found that in response to suspicion of Tarver's wrongdoing "Tarver's constitutional rights were not violated by the officers' actions in either arresting or detaining him." *Id.* Conduct that does not constitute a constitutional deprivation cannot be the basis of § 1983 liability. *See City of Los Angeles v. Heller*, 475 U.S. 797, 811, 106 S.Ct. 1571 (1986); *McKee v. City of Rockwall*, 877 F.2d 409, 414 (5th Cir. 1990). Since the police officers' conduct while arresting and detaining Plaintiff did not cause a constitutional deprivation, such conduct is not a basis for § 1983 liability. While Officer Bubela's conduct relating to the slamming incidents may serve as a basis for § 1983 liability, it is not of civil character, and therefore a policy

regarding civil matters is irrelevant.

Similarly, Plaintiff's arguments regarding a failure to adopt policies relating to the placing of persons in the back seat of a patrol car and the transporting and carrying of persons who are too large to sit upright in a police car fail because they are irrelevant. These policies relate to conduct by Officer Bubela and Chief Crider that has been explicitly determined not to have violated Plaintiff's constitutional rights. Therefore, the alleged absence of these policies may not serve as bases for § 1983 liability.

Plaintiff's two remaining arguments posit that the failure to adopt policies relating to the handling of arrestees and detainees with serious health problems and the handling of third parties aiding an arrestee or detainee caused Plaintiff's injury. Plaintiff relies on the deposition testimony, affidavit, and report of his expert, former Victoria County Sheriff Mike Ratcliff, to establish obviousness of likelihood of violation of constitutional rights and deliberate indifference. Mr. Ratcliff asserts that the aforementioned policies were necessary in light of various information including Officer Bubela's testimony regarding his specific training and the City's written policies and procedure manual. Each of these sources, however, contains insufficient evidence to establish obviousness of likelihood of violation of constitutional rights or deliberate indifference.

The City's written policies and procedure manual required its officers not to violate the constitutional rights of its citizens, only to use appropriate force and to adequately care for individuals in the City's custody, contrary to the conclusions of Mr. Ratcliff. (Dkt. # 75-11 at 5-6, 9, 10-17, 19, 26-27.) (Dkt. # 75-12 at 1-6.) Although the City's written policies did not employ the precise language Plaintiff sets forth, existing policies were sufficiently broad to govern the subject matter of the policies Plaintiff claims were absent. The City had reason to believe Officer Bubela

10

understood how to comply with these existing policies because he was trained in accordance with state-mandated training requirements. (Dkt. # 75-8 at ¶ 2.) Such training addressed criminal law, patrol procedure, mechanics of arrest, use of force and providing emergency medical treatment. (Dkt. # 75-8 at ¶ 24.) Furthermore, there is no independent evidence in the record of previous complaints or incidents involving individuals with serious health conditions or third parties interacting with detainees that would prompt the City to conclude that its policies were inadequate. None of the circumstances indicate that it was obvious that the City needed to implement the additional policies Plaintiff claims were absent.

Furthermore, to establish the essential element of deliberate indifference, a finding of conscious disregard of known or obvious consequences of a failure to act on the part of the municipality is required. *Bryan County*, 520 U.S. at 410. The record is devoid of evidence suggesting conscious disregard on the part of the City pertaining to its alleged failure to adopt Plaintiff's allegedly absent policies. The Court notes that Officer Bubela's testimony does indicate that he believed that he was not trained in the relatively specific policies described by Plaintiff. (Dkt. # 80-2 at 4-7.) However, written City policy, procedures and state-mandated training address this subject matter as previously described. There is no evidence indicating that the City was aware or should have been aware of Officer Bubela's perceived lack of training, let alone any conscious disregard of such beliefs or their consequences sufficient to establish that the City was deliberately indifferent. Mr. Ratcliff's testimony alone is insufficient to establish a claim for failure to adopt a policy. *See Stokes v. Bullins*, 844 F.3d 269, 275 (5th Cir. 1988); *Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998). Therefore, the Court finds that Plaintiff's claims for failure to adopt policies may not be sustained.

11

**B.  Failure to Train**

Plaintiff argues that the City failed to train Officer Bubela regarding (1) how to transport or care for a detainee; (2) what to do if a detainee had a serious health condition; (3) how to control a detainee while they are in a patrol car; (4) the dangers of a patrol car door; and (5) how to handle a situation where a third party would open up a patrol car.  Plaintiff's claims are without merit.

To establish a failure to train claim, plaintiff must demonstrate that (1) the training procedures of the municipality were inadequate; (2) the municipality's policymaker was deliberately indifferent in adopting the training policy; and (3) the inadequate training policy directly caused the plaintiff's injury.  *Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996) (citing *City of Canton*, 489 U.S. at 385-87).  Plaintiff must show more than that "an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct [because] ... [s]uch a claim could be made about almost any encounter resulting in injury ...."  *City of Canton*, 489 U.S. at 391.  Generally, a plaintiff cannot sustain a failure to train or inadequate training claim under § 1983 if the municipality in question complies with state-mandated training standards for its officers.  *See Benavides v. County of Wilson,* 955 F.2d 968, 972-73 (5th Cir. 1992); *Gonzales v. Westbrook*, 118 F.Supp.2d 728, 737-38 (W.D. Tex. 2000); *Huong v. City of Port Arthur*, 961 F.Supp. 1003, 1007 (E.D. Tex. 1997).  *See also Conner v. Travis County*, 209 F.3d 794, 798 (5th Cir. 2000); *Santiago v. City of Houston*, No. 04-1103, 2005 WL 1711863, at *10 (S.D. Tex. July, 20, 2005); *Holland v. City of Houston*, 41 F.Supp.2d 678, 707 (S.D. Tex 1999).

It is undisputed that Officer Bubela completed training that complied with state-mandated requirements prior to the underlying events in this case.  (Dkt. # 75-8 ¶ 2).  At the time of the slamming incidents, Officer Bubela was a licensed peace officer in accordance with the Texas

Commission on Law Enfocement Standards and Education ("TCLEOSE").   (Dkt. # 75-8 ¶ 2).

Officer Bubela obtained a basic peace officer license in 1994 and an intermediate peace officer

license in 1998.  (Dkt. # 75-8 ¶ 24).  In 1993, Officer Bubela graduated from the Wharton County

Junior College Law Enforcement Academy, completing instruction addressing criminal law,

criminal investigation, juvenile issues, interpersonal communication, patrol procedure, investigation,

use of force, mechanics of arrest and providing emergency medical assistance.(Dkt. # 75-8 ¶ 26).

Subsequent to graduation from the police academy, but before the events underlying this case,

Officer Bubela received additional training addressing criminal investigation, patrol tactics, use of

force, family violence and law.  (Dkt. # 75-8 ¶  27).

Plaintiff relies on conclusory assertions of a lack of training in addition to the deposition

testimony, affidavit, and report of his expert, Mr. Ratcliff, to establish that the City failed to train

Officer Bubela.  However, the City was entitled to rely on Officer Bubela's compliance with state-

mandated training requirements, which addressed the subject matter described in Officer Bubela's

deposition.  No evidence has been identified of independent complaints or incidents sufficient to

notify the City of inadequate training.  No evidence has been submitted demonstrating that the City

was aware of or had reason to be aware of Officer Bubela's views  regarding his perceived lack of

his training or the consequences thereof.  Therefore, there is insufficient evidence to establish

deliberate indifference on the part of the City regarding a failure to train or that the training

procedures of the City were inadequate.

## C.  Custom or Policy Demonstrated though Ratification of Certain Conduct

Finally, Plaintiff submits that Chief Crider's actions in his role as a final decision-maker for

the City of Edna clearly ratified or condoned Officer Bubela's conduct during the slamming

13

incidents thereby establishing an informal City policy or custom permitting such conduct.[2]  Plaintiff

relies on *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), for the proposition that

subsequent acceptance of a subordinate's reckless conduct by a policymaker is sufficient evidence

to prove his preexisting disposition or policy.[3]  Plaintiff argues that since Chief Crider did not

discipline Officer Bubela for participating in the slamming incidents, a reasonable jury could

conclude that Officer Bubela's conduct conformed to a City policy or custom permitting excessive

force.

In *Grandstaff*, the Fifth Circuit permitted a jury to find a municipal policy after hearing

evidence describing a single day of egregious events and the subsequent failure to discipline officers

involved in those events.  767 F.2d at 171-72.  The Fifth Circuit's reasoning in *Grandstaff*  was

influenced by extreme factual particularities.   The Appellate Court has summarized the

circumstances surrounding *Grandstaff* as follows:

> [I]n response to a minor traffic violation, three patrol cars engaged in a high speed
> chase during which they fired wildly at the suspected misdemeanant; the object of
> this chase took refuge on an innocent person's ranch, where the entire night shift of
> the city police force converged and proceeded to direct hails of gunfire at anything
> that moved; although nobody except the police was ever shown to have fired a shot,
> the innocent rancher was killed when the police shot him in the back as he was
> emerging from his own vehicle; after this "incompetent and catastrophic

---

[2]  Defendant does not dispute Plaintiff's contention that Chief Crider is a final decision maker in the City of Edna with respect to police conduct.  And the Court finds that the record, including the testimony of Defendant's 30(b)(6) representative, supports the conclusion that Chief Crider was a final decision maker in the City of Edna with respect to police conduct.  Defendant does, however, dispute Plaintiff's argument that Chief Crider's conduct qualifies as a "decision" intended to carry the imprimatur of the Chief's official authority.  Specifically, Defendant argues that Chief Crider cannot be said to have ratified or condoned Officer Bubela's conduct.

[3] Plaintiff's responses to requests for document production and interrogatories demonstrate that Plaintiff does not present or rely on any additional evidence of prior misconduct evidencing a City policy or custom.  (Dkt. # 75-14 at 4,9).

performance," which involved a whole series of abusive acts, the officers'
supervisors "denied their failures and concerned themselves only with
unworthy, if not despicable, means to avoid legal liability."

*Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986) (internal citations omitted).  Subsequent

Fifth Circuit cases emphasize that the rationale presented in *Grandstaff* may only be applied to cases

with equally extreme factual circumstances.  *Id* at 1161-62; *see also Stokes*, 844 F.2d at 274 n. 8;

*Snyder*, 142 F.3d at 797-98.  In cases without equally extreme facts, the Fifth Circuit does not permit

an inference of an unconstitutional custom or policy from a municipality's failure to discipline an

officer for a single incident.  *See Fraire v. City of Arlington*, 957 F.2d 1268, 1278-79 (5th Cir. 1992)

(discussing *Berry v. McLemore*, 670 F.2d 30 (5th Cir. 1982)).  Not surprisingly, *Grandstaff* has not

enjoyed wide application.

   *Grandstaff* and its progeny require this Court to determine whether the facts of this case are

sufficiently extreme to permit an inference of municipal policy.  At the outset, the Court finds it

particularly important that Chief Crider, who was present at the scene, cannot be said to have

witnessed or participated directly in the slamming incidents.[4]  Plaintiff does not argue that Chief

Crider saw the alleged misconduct or participated in it.  Furthermore, in its order of May 11, 2004,

the Court found Chief Crider "not [to be] directly involved in the incidents that occurred after

Plaintiff was handcuffed."  (Dkt. # 38 at 16).  The Court continued, "Plaintiff has provided no

argument to suggest that Defendant Crider was aware that the events [of the slamming incidents]

were occurring." (Dkt. # 38 at 16).  The Fifth Circuit affirmed these findings on appeal, thereby

binding this Court.  *Tarver*, 410 F.3d at 754.  Crider's own affidavit, indicating that he never

---

   [4] Contemporaneous awareness of and direct involvement in the slamming incidents
would  add support for a basis of liability under § 1983.  *See Cook v. City of Miami*, 464 F.Supp.
737 (S.D. Fla.1979).

witnessed Bubela's interactions with Tarver after his placement in the patrol car, remains uncontroverted.  (Dkt. # 75-9 ¶¶ 9,10).

Nonetheless, Plaintiff argues that because  the City never conducted a formal investigation into Plaintiff's allegations and never disciplined Officer Bubela, an application of *Grandstaff* is warranted.  Plaintiff emphasizes that the Mayor was informed of the alleged police misconduct shortly after the incident occurred, and yet nothing was done in response.  (Dkt. # 75-6 at 34); (Dkt. # 90 at 12).  In conjunction with Plaintiff's argument, the Court also considers the undisputed fact that Chief Crider was present at the scene of the alleged misconduct.  Therefore, the Court must decide whether the City's lack of investigation and disciplinary action, coupled with Chief Crider's mere presence on the scene, amounts to a sufficiently extreme circumstance.

The Court begins by observing that in *Grandstaff* it was clear that all versions of the events were completely indefensible.  767 F.2d at 171-172; *Coon*, 780 F.2d at 1162.  An innocent civilian had been killed unnecessarily because of reckless police conduct and that conduct was later defended by municipal officials. *Grandstaff*, 780 F.2d at 171.  In the present case, however, Plaintiff has not demonstrated that all possible versions of the events surrounding the alleged misconduct were manifestly indefensible.  Instead, when Plaintiff allegedly complained to the Mayor, the only support Plaintiff offered consisted of Plaintiff's complaints themselves.  No blood or other physical evidence of misconduct was immediately presented.  (Dkt. # 75-6 at 30).  No documentary evidence of misconduct had been submitted.  According to Vera Tarver and Freddie Tarver, Plaintiff did not even complain to Chief Crider at the scene, but instead shook Chief Crider's hand.  (Dkt. # 75-6 at 34); (Dkt. # 75-7 at 18).  Such facts do not present a situation where all alternative versions of events

16

become untenable.[5]  This is in sharp contrast to the circumstances surrounding *Grandstaff*, where it was immediately apparent that the conduct presented in that case was necessarily improper.

An examination of Plaintiff's remaining alleged facts further demonstrate insufficient extremity to permit an application of *Grandstaff*.  Only a single police officer from the City of Edna, namely Officer Bubela, was allegedly involved in misconduct.  In *Grandstaff,* however, the entire night shift of the City of Borger was involved in misconduct.  The absence of group misconduct in this case suggests that the alleged misbehavior may have been a result of a momentary lapse in judgment or an individual predilection rather than a municipal policy.

Furthermore, although Chief Crider was present on the scene of the alleged misconduct, Chief Crider cannot be said to have been aware of or to  have witnessed the slamming incidents, as discussed above.  However, a portion of Freddie Tarver's deposition testimony suggests that Chief Crider was oriented on one side of the police car containing Plaintiff during the slamming incidents.  (Dkt. # 75-7 at 17).  Therefore, the Court considers whether Chief Crider's mere presence during the slamming incidents is sufficient to infer a municipal policy or custom.  The Court finds that under the circumstances of this case, it is not.

The Fifth Circuit has held that if "police officers know at the time they act that the use of excessive force when arresting persons will meet with the approval of city policymakers, then the causation requirement has been met."  *Palmer v. City of San Antonio*, 810 F.2d 514, 516 (5th Cir. 1987) (citing *Grandstaff*, 727 F.2d at 169).  In the present case, there is insufficient evidence to show that Officer Bubela knew that his actions would be met with the approval of Chief Crider.

---

[5] Officer Bubela has provided a viable alternate version of events.  (Dkt. # 75-8).  Had the Mayor or Chief Crider been presented with Officer Bubela's version, they would have been entitled to rely on it.  *See Coon*, 780 F.2d at 1162.

Although Freddie Tarver claims that Chief Crider was within viewing distance of the misconduct, he does not indicate how closely Chief Crider was to the patrol car holding Plaintiff during the slamming incidents. (Dkt. # 75-7 at 17).  His testimony merely indicates that Chief Crider was oriented on one side of the patrol car rather than the other. (Dkt. # 75-7 at 17).  This evidence is insufficient to establish that Chief Crider was in close proximity to Officer Bubela at the time of the slamming incidents.  Vera Tarver has testified that during the second slamming incident, which Freddie allegedly witnessed, Chief Crider was in the vicinity of Freddie's truck. (Pl.'s Ex. C p. 44).  Furthermore, Chief Crider's claims that he did not witness any misconduct remain uncontroverted. (Dkt. # 75-9 ¶¶ 9,10).  There is no evidence that Officer Bubela had Chief Crider's attention or that Chief Crider exerted any pressure of conformity through observation.  Similarly, there is no evidence that the Chief engaged in any affirmative acts demonstrating approval of Officer Bubela's conduct.  It cannot be said that Chief Crider was even aware of Officer Bubela's alleged misconduct. As such, the evidence does not show that Officer Bubela would have known that his actions would have been met with approval.  The detached nature of the Chief's presence is insufficient to infer a municipal policy from a pressure to conform to Chief Crider's expectations.  Such circumstances more closely resemble impermissible *respondeat superior* liability than a municipal policy.

Considering the Plaintiff's allegations as a whole, the Court finds Plaintiff's facts are not sufficiently extreme to warrant application of *Grandstaff*.  At most, Plaintiff's evidence supports a finding of a single failure to investigate or discipline that cannot give rise to municipal liability.  *See Fraire*, 957 F.2d at 1278-79; *Piotrowski v. City of Houston*, 237 F.3d 567, 582 (5th Cir. 2001).

## CONCLUSION

Defendant City of Edna's Motion for Summary Judgment (Dkt. #74) is GRANTED.

It is so ORDERED.

Signed this 26th day of October, 2006.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE